**In re CHICAGO, M., ST. P. & P. R. CO.**

No. 60463.

District Court, N. D. Illinois, E. D.

Oct. 21, 1940.

Stewart & Shearer, of New York City, and Wilson & McIlvaine, of Chicago, Ill., for United States Trust Co. of New York.

Wright, Gordon, Zachry & Parlin, of New York City, and D'Ancona, Pflaum & Kohlsaat, of Chicago, Ill., for Chemical Bank & Trust Co.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, and Tenney, Harding,

Sherman & Rogers, of Chicago, Ill., for Guaranty Trust Co. of New York.

Shearman & Sterling, of New York City, and Montgomery, Hart, Pritchard & Herriott, of Chicago, Ill., for National City Bank of New York.

Mitchell, Taylor, Capron & Marsh, of New York City, and Winston, Strawn & Shaw, of Chicago, Ill., for City Bank Farmers Trust Co.

Sidley, McPherson, Austin & Burgess, of Chicago, Ill., for Institutional Investors Committee.

Guggenheimer & Untermeyer, of New York City, and Sabath, Perlman, Goodman & Rein, of Chicago, Ill., for Anglo-Continentale, Treuhand, A. G.

Jack E. Bagon, of New York City, and McDonald & Richmond, of Chicago, Ill., for Imperial Trust Co., Limited, and others.

Shulman, Shulman & Abrams, of Chicago, Ill., for Israel Abrams and others.

Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for preferred stockholders protective committee.

Oliver & Donnally, of New York City, and Charles W. Paltzer, of Chicago, Ill., for August Ihlefeld, Jr., and others.

Hodges, Reavis, Pantaleoni & Downey, of New York City, and Malcom Mecartney, of Chicago, Ill., for E. Stanley Glines and others.

Hunt, Hill & Betts, of New York City, and Bell, Boyd & Marshall, of Chicago, Ill., for Chas. B. Roberts, III, and others.

Barnes, Myers & Price, of Philadelphia, Pa., and Bell, Boyd & Marshall, of Chicago, Ill., for Girard Trust Co.

C. M. Clay, Asst. Gen. Counsel, of Washington, D. C., and Lee Walker, of Chicago, Ill., for Reconstruction Finance Corporation.

Ernest S. Ballard and Minier Sargent, both of Chicago, Ill., for Massachusetts Mut. Life Ins. Co. and another.

Frederick J. Moses, of New York City, and Wilson & McIlvaine, of Chicago, Ill., for Princeton University and others.

West & Eckhart and William A. McSwain, all of Chicago, Ill., for Chicago, T. H. & S. E. Ry. Co.

Julius Weiss, of New York City, and Jesse L. Cook, of Chicago, Ill., for Independent Committee for Protection of Chicago, M., St. P. & P. R. Co.

Gardner, Carton & Douglas, of Chicago, Ill., and Pierce & Greer and F. C. Nicodemus, Jr., all of New York City, for Chicago, M., St. P. & P. R. R.

A. N. Whitlock and C. S. Jefferson, both of Chicago, Ill., for Henry A. Scandrett and others.

IGOE, District Judge.

### History of the Proceeding.

The Chicago, Milwaukee, St. Paul and Pacific Railroad Company, the debtor in this proceeding, is a railroad corporation organized under the laws of the State of Wisconsin and is the successor in interest of Chicago, Milwaukee & St. Paul Railway Company, reorganization of which, pursuant to receivership proceedings, was concluded in 1928. The debtor filed its petition with this court on June 29, 1935, stating that it was unable to meet its debts as they matured and that it desired to effect a plan of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The court approved the petition as properly filed and authorized the debtor to continue in the possession and control of its properties and assets. Thereafter, the court by order of October 17, 1935, appointed Henry A. Scandrett, Walter J. Cummings and George I. Haight trustees of the property of the debtor. Following the ratification of their appointment by the Interstate Commerce Commission and their qualification, the trustees so appointed took possession of the property and assets of the debtor on January 1, 1936, and since said time have continued in the possession and control of the same and the operation thereof.

The debtor filed with its petition a plan of reorganization dated July 1, 1935. Said plan was also filed with the Interstate Commerce Commission and, after due notice, hearings thereon were held by the Commission on August 5–7, 1935, June 16, and September 20, 1937. At the hearings in August, 1935, the debtor presented certain amendments to its plan. The Interstate Commerce Commission, on September 24, 1937, entered its order reopening the proceedings for further hearings, which order provided that any plan to be considered at said hearings should be filed on or before January 10, 1938. On said date a plan was filed by a group of institutional investors, holders of securities of the debtor and other corporations involved in these proceedings, in an aggregate amount of $81,731,200. That plan was amended on

January 24, 1938, by a modified plan filed by the same group. Certain modifications to that plan were proposed by the debtor on February 1, 1938. Pursuant to notice, further hearings began before the Commission, upon that plan and other plans theretofore filed, on the first day of February, 1938, the hearing continuing until February 4, 1938. Hearing was resumed on March 21, 1938, and continued through March 22, 1938, on which date hearings were finally closed. In addition to the debtor and the institutional investors, various parties and intervenors participated in the hearings had before the Commission, including mortgage trustees, committees, groups and individuals. The names and interests of those participating are shown in the report of the Commission to which reference is hereinafter made.

Briefs were filed by various parties and intervenors. On November 5, 1938, the Commission's Examiner issued a proposed report as to a plan of reorganization for the debtor's property. Thereafter, exceptions to the proposed report and briefs in support thereof, and later, briefs in reply thereto, were filed by various parties and intervenors. Oral arguments were held before the entire Commission on April 12, 1939.

Subsequent to the hearings and the issuance of the Examiner's report, a protective committee for the holders of preferred stock filed a petition requesting that the proceeding be reopened for the filing of a plan based upon a proposed consolidation of the debtor's properties with those of the Chicago and North Western Railway Company. A similar petition was filed in the North Western proceedings by a protective committee for the holders of common stock of that company. After hearing oral arguments on the questions involved, Division 4 of the Commission denied both petitions on January 19, 1939.

The Commission filed and issued its report and order on February 12, 1940, approving a plan of reorganization for the debtor. Thereafter various petitions for modification of the plan so approved were filed on behalf of numerous parties and intervenors and on June 4, 1940, the Commission filed and issued a supplemental report and order wherein, after consideration of the matters presented in the various petitions for modification of the plan initially approved, the Commission modified the plan in certain respects and in its supplemental order of June 4, 1940, re-

voked and superseded the prior order of February 12, 1940, and set out and approved a modified plan of reorganization of the debtor. Said reports and orders were duly certified to this court.

On April 26, 1940, the court made an order requiring all claims against the debtor's estate for the allowance of expenses or compensation for services incurred or rendered up to May 15, 1940, in connection with the reorganization proceedings or plan to be filed on or before May 31, 1940, and directing that notice be given. Notice was given as required in said order and thereafter various claims were filed and a hearing was had thereon before the Commission's Examiner at Brooklyn, New York, on July 15–19, 1940, and the Commission, on October 2, 1940, made its report fixing maximum limits for allowances to be made with reference to the claims filed, which report was duly certified to this court.

On June 21, 1940, the court made an order fixing September 4, 1940, as the date for hearing all objections to the modified plan of reorganization as set out in the Commission's supplemental order of June 4, 1940, and all claims for equitable treatment as well as all claims for allowances of expenses or fees incident to the reorganization proceedings and the plan and requiring all objections to said plan and claims for equitable treatment to be filed on or before the first day of August, 1940, and briefs in support thereof to be filed on or before the 20th day of August, 1940, and directing notice to be given. Notice was given as required by the order and various objections and claims for equitable treatment, all of which will be hereinafter dealt with, were filed. The hearing upon the plan was begun on September 4, 1940, and was concluded on September 13, 1940, on which date the matter was continued until October 21, 1940, for consideration of allowances for fees and expenses, the maximum allowances not having been fixed by the Commission. It was agreed by all parties in interest that the matter of said allowances should be submitted to the court upon the record made before the Commission's Examiner, without the taking of further testimony.

The Commission having filed its report fixing maximum limits for allowances as above recited, the said modified plan as well as allowances to be made for the period covered by the respective claims thus come before the court for consideration.

## Description of Property.

The debtor's property embraces a system of railroad extending from Chicago to Seattle, Tacoma and other Puget Sound points with lines extending to Kansas City, Missouri, Omaha, Nebraska, Rapid City, South Dakota, Fargo, North Dakota, Champion and Ontonagon, Michigan, Oglesby, Illinois, Westport, Indiana, and other points. As shown by the 1939 Annual Report to Stockholders, the system includes 9,739.07 miles of solely owned road, 170.91 miles of jointly owned road, 332.68 miles of leased lines and 659.25 miles operated under trackage rights, making a total of 10,901.91 miles of road; also, additional main tracks aggregating 1,224.10 miles and yard tracks and sidings aggregating 4,186.38 miles, making a grand total for all tracks of 16,312.39 miles, together with rolling stock, equipment, terminals and other facilities and properties. The lines east of Mobridge, South Dakota, are commonly referred to as the eastern lines and those west of that point are known as the western lines. These latter lines were opened for through traffic in 1909, and include a small amount of line formerly owned by the Bellingham Bay & British Columbia Railroad Company extending from Bellingham to Glacier, with branches to Lynden and Kulshan, in the State of Washington. The eastern lines include the lines formerly owned by the Milwaukee and Northern Railway Company extending from North Milwaukee, Wisconsin, through Green Bay, Wisconsin, with a branch to Appleton, to Champion and Ontonagon, Michigan, via Channing, and a branch to Menominee, Michigan, referred to in these proceedings as the northern lines. They include also the line formerly owned by the Chicago, Milwaukee & Gary Railway Company extending from Delmar to Joliet, from Aurora to Kirkland, and from Camp Grant to Rockford, all in the State of Illinois, and referred to in these proceedings as the Gary, and the Terre Haute lines, hereinafter described.

The leased lines are owned by Chicago, Terre Haute & Southeastern Railway Company, extend from Chicago Heights, Illinois, to Westport, Sullivan and Oolitic, Indiana, and include the lines formerly owned by the Bedford Belt Railway Company and the Southern Indiana Railway Company. Those lines are collectively referred to in these proceedings as the Terre Haute and are leased to the debtor for a term of 999 years from July 1, 1921, the rental reserved being a sum equal to the corporate expenses of the lessor, not exceeding $12,000 per year, taxes, sums owing by the lessor under leases and trackage agreements and an amount equal to the interest on the bonds outstanding, or to be issued by the lessor pursuant to the terms of the lease, against the Terre Haute property. The lessee further agreed to assume the payment of the principal of said bonds. The lease contains a provision that at the end of its term, or upon earlier termination, the lessee shall surrender the leased property to the lessor in good order and condition, ordinary wear and tear excepted, with such additions, alterations, betterments, improvements and extensions as shall have been made thereto, free and clear of all liens and encumbrances except those created by the lessor prior to the date of the lease or subsequently thereto pursuant to the provisions thereof, and upon payment by the lessor to the lessee of the then existing fair value of all such additions, alterations, betterments and improvements, including rolling stock and equipment, and extensions, the cost of which shall not be represented by any then outstanding bond or other evidence of indebtedness made or issued by the lessor and secured by a lien upon the leased property, and the entire amount expended by the lessee, but without interest thereon, under the terms of the lease to pay off and discharge the principal of all or any of the bonds of the lessor, or of obligations representing any extension or extensions, renewal or renewals or any refunding or refundings of the whole or any part of said bonds, provided that the lessor shall not, in so doing, be required to pay any sum in excess of the then existing fair value of the leased property.

According to the Report of the Bureau of Valuation, of the Interstate Commerce Commission, on the elements of value of the system, as of December 31, 1935, the cost of reproduction of the system, exclusive of the Terre Haute, less depreciation, together with the value of lands and rights and the allowance for working capital, was $632,327,582 and the corresponding figure for the Terre Haute was $20,680,114.

## Outstanding Obligations.

The existing mortgages constituting liens upon the property of the debtor are fully set forth in Exhibit No. 73 before the Interstate Commerce Commission but for

the purposes of this discussion the following statements will suffice:

The Milwaukee and Northern Railroad Company first mortgage is a first lien upon the northern lines between North Milwaukee and Green Bay, Wisconsin. There are outstanding under it bonds in the hands of the public in the aggregate principal amount of $2,117,000 and $38,000, principal amount, owned by the debtor and pledged under the first and refunding mortgage of the debtor.

The Milwaukee and Northern Railroad Company consolidated mortgage is a second mortgage upon the same lines upon which the Milwaukee and Northern Railroad Company first mortgage is a first mortgage and is a first mortgage upon the portion of the northern lines extending from Green Bay, Wisconsin, northward. There are outstanding under it bonds in the hands of the public in the aggregate principal amount of $5,072,000 and $20,000, principal amount, owned by the debtor and likewise pledged under debtor's first and refunding mortgage.

The Chicago, Milwaukee and Gary Railway Company first mortgage is a first lien upon the Gary line. There are outstanding under it bonds in the hands of the public in the aggregate principal amount of $3,000,000 and $2,700,000, principal amount, owned by the debtor and pledged under debtor's first and refunding mortgage.

The Bellingham Bay and British Columbia Railroad Company first mortgage is a first lien upon the Bellingham Bay and British Columbia Railroad above described and secures bonds in the aggregate principal amount of $301,000, all of which are owned by the debtor and pledged as part security for loan from Reconstruction Finance Corporation to the debtor.

Four mortgages, in addition to the mortgages of the debtor hereinafter referred to, affect the Terre Haute properties. The Bedford Belt Railway Company first mortgage is a first lien upon the portion of the Terre Haute lines extending from Bedford to Oolitic, Indiana, a distance of 4.66 miles. Under that mortgage there are outstanding in the hands of the public bonds in the aggregate principal amount of $250,000 and $100,000, principal amount, pledged with the trustee of Chicago, Terre Haute and Southeastern Railway Company first and refunding mortgage. The Southern Indiana Railway Company first mortgage is a first lien upon the portion of the Terre Haute Lines extending from the Illinois-Indiana State Line, near West Dana, to Belt Junction and from Terre Haute to Westport, together with certain branch lines, and a second lien upon the line covered by the first lien of The Bedford Belt Railway Company. Under that mortgage there are outstanding in the hands of the public bonds in the aggregate principal amount of $7,287,000. The Chicago, Terre Haute and Southeastern Railway Company first and refunding mortgage is a first lien upon the portion of the Terre Haute lines extending from Chicago Heights to the Illinois-Indiana State Line, a second lien upon the properties subject to the first lien of the Southern Indiana Railway Company first mortgage, and a third lien upon the property subject to the first lien of The Bedford Belt Railway Company first mortgage. There are outstanding under the Chicago, Terre Haute and Southeastern Railway Company first and refunding mortgage in the hands of the public bonds in the aggregate principal amount of $8,056,000 and $1,515,000, principal amount, owned by the debtor and pledged under debtor's first and refunding mortgage, and $2,000, principal amount, held in the treasury of the issuing company. The Chicago, Terre Haute and Southeastern Railway Company income mortgage covers the same property as the Chicago, Terre Haute and Southeastern Railway Company first and refunding mortgage but is junior to that mortgage and to the Southern Indiana Railway Company first mortgage and the Bedford Belt Railway Company first mortgage. There are outstanding under this mortgage bonds in the hands of the public in the aggregate principal amount of $6,336,000 and $164,000, principal amount, are held in the treasury of the Chicago, Terre Haute & Southeastern Railway Company.

The Chicago, Milwaukee & St. Paul Railway Company general mortgage was left undisturbed by the reorganization of 1928 and is a first lien upon the eastern lines with the exception of the northern lines, the Gary and the Terre Haute and except also that the status of certain separate lines referred to in the record as seventeen pieces of lines east is in dispute as to whether or not the lien of the general mortgage or of debtor's first and refunding mortgage is prior. There are outstanding under the general mortgage bonds in the hands of the public in the aggregate principal amount of $138,788,000 and $11,212,000, principal amount, owned by the

debtor and pledged with the Reconstruction Finance Corporation as security for loans to the debtor.

Subject to the Bellingham Bay and British Columbia Railroad Company first mortgage, above referred to, the debtor's first and refunding mortgage is a first lien upon the western lines and is also a second lien upon the lines on which the general mortgage is a first lien and a lien upon the northern lines and the Gary junior to Milwaukee and Northern Railroad Company first mortgage, Milwaukee and Northern Railroad Company consolidated mortgage and Chicago, Milwaukee and Gary Railway Company first mortgage, and is likewise a lien upon the Terre Haute lease. There were issued under debtor's first and refunding mortgage bonds in the aggregate principal amount of $9,866,000, all of which are owned by the debtor and of which $8,665,000, principal amount, are pledged as collateral for a loan to the debtor from Reconstruction Finance Corporation, $258,000, principal amount, were pledged with the trustee under equipment trust, Series M, and $943,000, principal amount, are held in the treasury of the trust estate.

Debtor's fifty year mortgage due February 1, 1975, covers the same property as is covered by the debtor's first and refunding mortgage and is junior in lien to that mortgage. There were issued thereunder bonds in the aggregate principal amount of $106,395,096, all of which are outstanding in the hands of the public with the exception of $426,317, principal amount as of June 30, 1935, held for issue of securities not yet presented for exchange under the reorganization of 1928.

Debtor's convertible adjustment mortgage covers the same property as is covered by the first and refunding mortgage and the fifty year mortgage and is junior as to lien to both of those mortgages. There were issued under debtor's convertible adjustment mortgage $182,873,693, principal amount, of bonds, of which amount all are outstanding in the hands of the public except $152,487, principal amount, as of June 30, 1935, which are held for exchange for securities not presented under the plan of reorganization of 1928.

In addition to the bonds, there were outstanding as shown by the Revised Appendix attached to the supplemental report of the Interstate Commerce Commission of June 4, 1940, equipment obligations in the principal amount $33,322,999. This amount as of August 15, 1940, as shown by Exhibit No. 7 introduced at the hearing before this court, was reduced to $32,654,649.

In addition, loans from the Reconstruction Finance Corporation, as shown in said appendix, amounted to $12,920,463, which amount the records in this proceeding indicate has been reduced by the amount of $290,000, paid in January, 1940.

In addition, said appendix shows an outstanding note of the trustees to Continental Illinois National Bank and Trust Company of Chicago amounting to $1,184,000. The record does not show the extent to which this has been paid.

Reports of the master filed and approved by this court show unsecured claims to date allowed in the total amount of $747,319.89, and claims given priorities amounting to $55,468.39.

In addition, there is outstanding preferred stock of the debtor in the principal amount of $119,307,300 and 1,174,060 shares of common stock of no par value.

### Capitalization and Fixed Charges Approved by Commission.

A tabulated statement, showing the existing obligations and stock of the debtor and the distribution of new securities under the plan approved and giving a summary of the plan, is attached to the supplemental report of the Commission dated June 4, 1940, and is designated as Revised Appendix. A copy thereof is attached hereto, marked "Exhibit A", and made a part hereof. This exhibit does not reflect payments, adjustments and charges made subsequent to its preparation which have been referred to in the foregoing discussion. A correction has been made in the exhibit in order to set out correctly the designation of the last two series of general mortgage bonds as "Series E" and "Series F" instead of "Series D" and "Series E" which latter designation was erroneous since there is no "Series D" outstanding. The exhibit likewise does not include obligations represented by guaranties of and assumption of liability with reference to certain terminal and other bonds of companies other than the debtor. These are referred to in the Commission's report and discussion concerning them is not essential to a determination of the matter in hand.

After a consideration of the record, which covers over 1600 pages of evidence and includes 219 exhibits, and having before

it evidence in respect to all proper elements as to value, valuation reports prepared by the Bureau of Valuation, evidence as to book value, past and present earnings of the property, estimates of future earnings presented by the debtor and others and various other basic information bearing upon the question of future earnings, the Commission states that, considering the past and prospective earnings of the debtor and all other relevant facts and the public interest, it is of the opinion and finds that the total capitalization of the new company should not exceed approximately $108,780,470 of fixed interest debt, $115,257,480 of contingent interest debt, $111,347,846 of preferred stock, par value $100, and 2,131,475¼ shares of common stock having no par value. The maximum capitalization so fixed by the Commission was arrived at by including $15,350,300, principal amount, of Terre Haute bonds, being the portion representing fixed interest as treated under the plan, and $6,578,700, principal amount, of Terre Haute bonds, being the portion representing contingent interest as treated under the plan. Taking the common stock at $100 per share, the total maximum capitalization approved by the Commission is $548,533,321. The total fixed interest debt requires an annual charge of $4,269,654. The plan provides a mandatory additions and betterments fund in an annual amount of $2,500,000, cumulative for one year. Annual contingent interest charges amount to $5,219,480. The annual sinking fund requirement is approximately $543,394. The total charges ahead of dividends under the plan amount to $12,532,528 and an additional discretionary additions and betterments fund is to be provided out of available net income remaining after the payment in full of contingent interest on the general mortgage series "A" bonds of the new company and the contingent interest on the Terre Haute bonds, it being provided that the total amount so set aside for an income period shall not exceed $5,000,000 or 4 per cent. of railway operating revenues, whichever amount is greater, less any amount applied out of the reserve and retirement fund for the income period for capital expenditures other than payments of equipment obligations and payments on account of new equipment. If the maximum discretionary additions and betterments fund is provided, there would be an additional $2,500,000 ahead of dividends.

## Those Supporting and Objecting to Plan.

The plan so approved by the Commission is supported by the group of institutional investors, the Mutual Savings Bank group, the Reconstruction Finance Corporation and the trustee under the Milwaukee and Northern Railroad Company mortgages upon the terms stated at the hearings. Counsel for the trustees also stated that, with certain corrections which could be made within the framework of the plan, the trustees felt that the plan, in the light of their knowledge of and experience in the operation of the property, was feasible.

Objections to the plan were filed by the debtor, the protective committee for preferred stockholders, the trustee under the general mortgage, the trustees of Princeton University and other holders of general mortgage bonds, the trustees under the fifty year mortgage and the protective committee for holders of fifty year mortgage bonds, the trustees under debtor's convertible adjustment mortgage, Israel Abrams and others, holders of adjustment mortgage bonds, the independent committee for the protection of bondholders, Imperial Trust Company and others, holders of Milwaukee and Northern Consolidated Mortgage bonds, Anglo-Continentale Treuhand, A. G., holders of Milwaukee and Northern first mortgage and consolidated mortgage bonds, trustees under the Gary mortgage and by various Terre Haute interests, including the Chicago, Terre Haute & Southeastern Railway Company, a committee for the protection of holders of Terre Haute bonds, Terre Haute income mortgage bondholders' committee, Massachusetts Mutual Life Insurance Company and other holders of Terre Haute bonds, Union Labor Life Insurance Company, also a holder of Terre Haute bonds, and the trustees under the several Terre Haute mortgages.

Objections requesting certain changes in the plan with reference to certain claims were filed by the Pennsylvania Railroad Company and the New York Central Railroad Company and an objection was also filed on behalf of Ida E. Herschensohn and Herbert L. Herschensohn requesting preferred treatment for personal injury claims. Full hearing, both orally and by brief, was granted to all objectors. The questions raised by the objections, insofar as necessary for a determination of the matter un-

der consideration, will be considered in the discussion which follows.

### Function of Commission and Court.

Subsection b of Section 77 provides: "(b) A plan of reorganization within the meaning of this section (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; (2) may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character, or otherwise; (3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan; (4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; (5) shall provide adequate means for the execution of the plan, which may include the transfer of any interest in or control of all or any part of the property of the debtor to another corporation or corporations, the merger or consolidation of the debtor with another corporation or corporations, the retention of all or any part of the property by the debtor, the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price, the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein, the satisfaction or modification of any liens, indentures, or other similar interests, the curing or waiver of defaults, the extension of maturity dates of outstanding securities, the reduction in principal and/or rate of interest and alteration of other terms of such securities, the amendment of the charter of the debtor, and/or the issuance of securities of either the debtor or any such other corporation or corporations for cash, or in exchange for existing securities, or in satisfaction of claims or rights or for other appropriate purposes; and may deal with all or any part of the property of the debtor; may reject contracts of the debtor which are executory in whole or in part, including unexpired leases; and may include any other appropriate provisions not inconsistent with this section."

After a plan is approved and certified by the Commission to the court and a hearing had thereon, as provided in the statute, the following provision in subsection e of Section 77 states the prerequisites to approval by the court: "After such hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12) of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same."

It is apparent that it was intended by the law that the bankruptcy court and the Interstate Commerce Commission should co-operate to the end that a fair and equitable plan of reorganization might be provided. Such purpose has been declared in a recent decision of the Supreme Court of the United States in Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L. Ed. 1118.

That court has not yet determined just what weight should be given by the court to the findings and conclusions of

the Commission. Clearly, the court has power to correct errors of law into which the Commission may have fallen and to set aside findings of fact which are not supported by the record or conclusions which violate constitutional rights. On the other hand, the initial determination of the questions bearing upon the soundness and reasonableness of a plan of reorganization is the responsibility of the Commission which is peculiarly fitted for the consideration of such questions and its findings and conclusions, made and reached after extended hearings and exhaustive study, as in this case, should be given great weight.

In these cases, the amount and character of the capitalization of the reorganized company, the fixed charges, and the distribution of new securities are all questions of prime importance, and their determination affects the public interest.

With these principles in mind, let us consider the objections which have been presented to this plan.

### Objections of Debtor.

The debtor objects, first of all, to the effective date of the plan, claiming that under the law the effective date must be the date when these proceedings were initiated and that interest accruing since that date should not be added in determining the amounts of claims of any creditors. The plan, for the purpose of treatment, includes interest to the effective date, January 1, 1939, in the case of all mortgage claimants except the holders of adjustment mortgage bonds as to whom interest is included to June 29, 1935.

There has been a recent change of counsel for the debtor, but it should be noted that the debtor, in its proposed modifications of the plan of the institutional group, approved January 1, 1939, as the effective date. The practice followed by the Commission in this case is similar to that followed in other reorganization cases which have come before it and it would seem that to date back the plan in the manner suggested would require a disregard by the Commission of the factual situation existing at the time the provisions of the plan were determined upon.

Not only is there no requirement in Section 77 that the effective date be coincident with the date of filing of the petition, but subsection e permits the inference that it was contemplated that the effective date should be the date to which the findings of the Commission relate. That subsection, in dealing with the exclusion of stockholders, states, as one of the prerequisites for such exclusion, that the Commission shall have found, and the judge shall have affirmed the finding, that at the time of the finding, the equity of the stockholders has no value.

■ Moreover, such proposed relation back and the consequent disallowance of interest are contrary to the uniform rule applying in insolvency proceedings generally that, in the case of secured creditors, unpaid interest accruing during the proceedings must be included in the claim. Ticonic National Bank v. Sprague, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926; In re Barclay Park Corporation, 2 Cir., 90 F.2d 595; Coder v. Arts, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772, 16 Ann.Cas. 1008.

The principle was approved by Judge Woodward in the proceeding under Section 77 of the Chicago Great Western Railroad Company, D. C., 29 F.Supp. 149, 161, and by Judge Barnes in the recent proceedings of In re Chicago & North Western Railway Company, D. C., 35 F.Supp. 230.

■ The Commission, in fixing the effective date and in the treatment of interest accruals, it is believed proceeded in the manner contemplated by the act and in accordance with the law applicable in such proceedings.

The debtor further contends that the plan is unfair and invalid because of its failure to give recognition to the stockholders. In this contention the debtor is supported by the committee for the preferred stockholders. It is contended that in order to determine whether or not there is an equity for the stockholders, there must be a valuation of the property and it is claimed that there has been no such valuation.

It should be noted that valuation is not made mandatory by the statute. Subsection e requires the Commission to determine value if it shall be necessary. Notwithstanding the fact that this proceeding has been pending for several years and there have been various hearings before the Commission and the several parties and intervenors have been represented by counsel eminent in practice of this character, no one appears to have suggested that any specific finding of value should be made or that any elements affecting value, other than those produced, should be considered by the Commission.

■ Moreover, the Commission has in its reports made all findings as to value

which would appear to be necessary for the purposes of this proceeding. In the first place, it has fixed a maximum permissible capitalization of $548,533,321 as contrasted with an existing debt, inclusive of interest to January 1, 1939, in excess of $626,000,-000. The fixing of this maximum capitalization necessarily involves a conclusion by the Commission that there is no equity for the stockholders. In addition to this, the Commission makes the following specific finding: "There is no evidence whatever to indicate that a recovery of the earning power of 1928–1929 is reasonably probable, and we regard it as a remote possibility only which may not be utilized to support a finding that the debtor's stockholders have an equity. In view of the earnings situation it would be improper to give controlling weight to the fact that the indicated reproduction cost value of the property exceeds the amount of the debt. We find that the equity of the holders of the debtor's preferred stock and its common stock has no value, and the holders of claims in classes 24 and 25, therefore, are not entitled to participate in this plan."

■ Counsel seem to labor under the impression that value for the purpose of these proceedings means only physical value as represented by original cost or reproduction cost with proper adjustment for depreciation, additions and betterments. Such elements were, of course, considered by the Commission as shown by its report but those elements are not to be exclusively considered and the value with which we are concerned is not merely physical value or value for rate-making purposes, but value in terms of furnishing support for a sound and workable financial structure. But in whatever sense the term value is employed, there is adequate evidence in this record to show that thorough consideration was given to all elements of value and that the conclusion of the Commission was reached in the light of such consideration.

■ Contrary to the contention of the debtor, the Commission was charged with the duty, not only of determining the amount of fixed interest debt of the new company, but also the contingent interest debt and it was in the public interest that the contingent interest debt be such that, as stated by the Commission, the total debt should bear a proper relation to the total capitalization and such as to make the payment of contingent interest a probability and of dividends a reasonable prospect, at least on the preferred stock.

The record shows that no dividends have been paid upon the stock of the debtor or its predecessor since 1917. Even in the ten-year period ending with 1930, which included the peak years of 1928 and 1929, income available for interest fell far short of the amount needed to service the funded debt which was less than on January 1, 1939, the effective date of the plan. This condition has been brought about not entirely by the financial depression but has been contributed to by many factors such as increased costs, taxes, wages, competition in other forms of transportation and the like. In no year since 1930 has the income available for interest been equal to the amount required under the proposed plan to meet charges ahead of dividends.

The objectors do not dispute any of the facts embodied in the elements considered by the Commission in reaching its conclusions but the contention is made that the outlook for the future is bright and the prospect for increased earnings promising and this situation, it is claimed, justifies a finding of some value for the equity owners. An expert was called who voiced this view and expressed at some length his opinion as to future earnings. That witness expressed the view that the debtor's properties were efficiently operated and were in good physical condition and that he felt, in the light of the present tendencies, that it was not too much to expect that a time might be reached, some time in the future, when the railroad might earn a sufficient amount to have available for the payment of interest $20,300,000. That time was referred to as the future normal year but the witness was unwilling even to venture a guess when such time might arrive. Moreover, if such an amount were earned and available for the payment of interest, the capitalization of this amount at 4 per cent. would produce slightly over $500,000,000 which is a less amount than the permissible capitalization fixed by the Commission. Under the plan approved by the Commission, if $20,300,000 were available for the payment of interest, there would only be enough to pay dividends on the new preferred stock and none on the new common, assuming the additional amount for additions and betterments contemplated by the plan were authorized by the board of directors, and the preferred stock under the plan represents the interests of present bondholders. If applied to the existing indebtedness, including unpaid accrued interest to January 1, 1939, such an amount would fall short by some $9,000,000

of paying interest at the average existing rate carried by the obligations of the debtor.

The debtor also appears to agree with the view expressed by the trustee under the general mortgage that the provision for the mandatory additions and betterments fund of $2,500,000 should be eliminated. This question will be more fully discussed in connection with the objections of the general mortgage trustee but it is noted that earlier in the proceedings the debtor was a strong advocate for an adequate additions and betterments fund, insisting that it should be maintained at a minimum of $5,000,000 with a mandatory annual payment of $2,500,000 and an additional discretionary payment sufficient to bring the total up to $5,000,000 or 4 per cent. of total revenues.

The debtor has filed, since the close of the hearing before the court, a so-called closing argument in which there is set forth what amounts to a proposed plan of reorganization. At the time of the hearing before the court counsel for the debtor offered in evidence what was referred to as an outline of a proposed capitalization, but upon objection it was excluded. It does not appear whether or not the proposed plan is the same as the material submitted at the hearing, but, in any event, no such plan was submitted to the Commission, and, of course, is not before the court for consideration. Insofar as it may be used as argument on behalf of the debtor's position, it appears to add nothing new to the argument heretofore analyzed.

The Commission points out that the fixed interest charges under the capitalization provided in the plan, amounting to $4,269,654, together with the mandatory additions and betterments fund of $2,500,000, making a total of $6,769,654, would be covered about 1.16 times by the average earnings of the period from 1931 to 1935 and 1.18 times for the period from 1932 to 1936. It is pointed out that in the years 1932, 1935, and 1938 such an amount was not earned and the Commission concludes that "between the clear demands of a conservative policy in the present reorganization and the claims and rights of first lien bondholders, we conclude that the limitation of fixed charges of the system at approximately $4,269,654 a year is reasonable and proper."

The court feels that the Commission, in determining the maximum permissible capitalization and fixed charges which the debtor could reasonably be expected to meet, and in concluding that the present stocks of the debtor are without value, gave adequate consideration to all elements which should be considered in determining such questions and that the Commission's conclusions as to those matters are sound. The same should be said as to the effective date and the inclusion, in the case of fixed interest bonds, of interest accruing up to that date.

Having considered the matter of capitalization and fixed charges, the remaining questions relate in the main to distribution. All agree that the equipment obligations of the debtor should remain undisturbed and be assumed by the new company. As to the loans from the Reconstruction Finance Corporation, it is not questioned that the value of the assets pledged to secure these loans far exceeds the amount due and, the loans being fully secured, no one objects to the treatment accorded these obligations, namely: the issuance of first mortgage bonds for 100 per cent. of the balance due after applying in reduction of the loans the cash on deposit in the hands of the trustees under debtor's first and refunding mortgage bonds which are pledged to secure the loans.

### The Terre Haute Objections.

Of prime importance in considering the fixed and contingent obligations of the new company is the question presented by the Terre Haute. The Terre Haute lines have already been described. As shown by the report, the reproduction value less depreciation was $20,680,114 as of December 31, 1935. The bonds outstanding in the hands of the public against the properties aggregate $21,929,000, principal amount, exclusive of $1,515,000, principal amount, owned by the debtor. Under the lease, to which reference has already been made, the debtor, by way of rental, is required to pay interest on the Terre Haute bonds representing an annual amount of $1,023,580. The obligation to pay interest, so far as the income bonds of the Terre Haute are concerned, is represented by an endorsement upon the bonds, which endorsement, however, specifically refers to the lease and makes it clear that the interest so paid represents a portion of the rental. The obligation to pay interest on the bonds other than the income bonds is found in the lease itself. In addition, the lease provides that the debtor shall pay the principal of the Terre Haute bonds, but attention has already been called to the provision that, at the end of

the term, the lessor, in order to repossess itself of the leased property, is required to repay the principal sums so paid by the lessee. The stock of the Terre Haute consists of 41,729.95 shares of which the debtor owns 40,470.95 shares, or approximately 97 per cent. It is apparent that the interest of the Terre Haute, as such, is essentially a bondholders' interest. If the principal and interest of the Terre Haute bonds are paid, then the interest of that company terminates.

The Terre Haute is not in bankruptcy and the Commission concluded that its financial structure and the rights of its creditors were not subject to the Commission's jurisdiction and that the Terre Haute bondholders were not such creditors of the debtor as to be bound by a confirmed plan of reorganization which divested them of their existing liens upon the Terre Haute properties. The Commission recognized that it was desirable that the operation of the Terre Haute properties by the debtor continue but concluded that, in view of the maximum limits set forth in the plan as to capitalization and fixed charges, it was necessary to make certain modifications in the Terre Haute lease and the obligations of the debtor thereunder. The plan provides that there shall be submitted to the Terre Haute bondholders certain provisions which include a proposal to extend their bonds, waive equipment vacancies and reduce the rate of interest on all of their issues, except the Southern Indiana Railway Company first mortgage bonds, from 5 per cent. to $4\frac{1}{4}$ per cent., the interest on the Southern Indiana bonds to be increased from 4 per cent to $4\frac{1}{4}$ per cent., all interest to be fixed to the extent of 2.75 per cent. and contingent upon system earnings as to 1.5 per cent. A new lease is proposed embodying these modifications. The plan provides that if these provisions are not accepted by substantially all of the Terre Haute bondholders, the existing lease shall be rejected as of the date of the determination by the court that the provisions have not been accepted, without prejudice to either the negotiation of a new lease or a consolidation of the Terre Haute properties with those of the new company on terms subject to the Commission's approval. The plan contemplates that the claim for damages resulting from the rejection of the lease shall constitute an unsecured claim against the debtor to be satisfied under the plan by the issuance of common stock in accordance with the plan.

The Terre Haute lease was made in 1921. The principal advantage to the debtor resulted from the fact that it made available to the debtor a coal supply for a large portion of its eastern lines. The exhibits introduced in evidence before the Commission and before the court showing an allocation of earnings to the Terre Haute lines upon the basis followed by the accountants in the preparation of the exhibits, disclose that the earnings so allocated to these lines are, and for some years have been, substantially in excess of the rental required to be paid in the form of interest on the outstanding bonds. This is true whether the exhibits are made up upon the basis of allowing tariff rates or out-of-pocket costs for the hauling of company coal, though, of course, the use of tariff rates shows substantially greater earnings.

The Terre Haute interests contend that the plan is inequitable and unfair because the relationship between the debtor and the Terre Haute is an arm's length relationship of lessor and lessee, the lease is profitable to the lessor and there is no reason for requiring the Terre Haute to make any sacrifice for the purpose of helping out the deficiency in earnings of the debtor. It should be stated that their principal objection is to any reduction or modification in the interest rate. No serious objection was voiced to the extension of bonds or to the waiver of equipment deficiencies. As to the latter, their position is easily understandable in the light of the fact that the equity in the property is owned by the debtor and there is little probability of its return to the lessor at the end of the period.

They also question the right of the Commission or the court to provide in the plan for the disaffirmance of a profitable lease, the contention being that the right to disaffirm runs only to those obligations which constitute a burden upon the debtor.

It is further contended that if said provisions are not accepted by the Terre Haute interests, and it is asserted by them that they will not be accepted, and the lease is disaffirmed, then the disaffirmance will relate to the time of the filing of the petition in these proceedings and the trustees will be required to account for the earnings since said date which they assert would amount to several million dollars for which no provision is made in the plan.

Finally they claim that the Terre Haute bondholders will become creditors if the

lease is disaffirmed and as such will be entitled to participate in the voting upon the plan, and that it follows that, if the lease is to be rejected, definite decision to that effect must be made prior to the referendum upon the plan for, otherwise, those injured by the rejection will be deprived of the right to vote their resulting claims upon the question of acceptance or rejection of the plan, thereby rendering the vote invalid.

■ It should be stated that the Terre Haute situation presents a troublesome question but, after all, the Commission and the court are faced with the duty of passing upon the reasonableness and fairness of a plan from the standpoint of all parties in interest and the public, and while they may not have jurisdiction to deal directly with the interests of the Terre Haute bondholders, they do have not only the right, but the duty, in the formulation of such plan, to deal with the property of the debtor, including its rights as lessee, or otherwise.

The evidence introduced shows that the value of the Terre Haute lease to the Debtor results in the main from two things. First, the provision of an available coal supply, already referred to, and, second, the fact that the demand for a large supply of railroad coal from mines located upon the Terre Haute lines makes it possible to keep those mines open and enables them to produce coal to be marketed commercially, thus providing substantial tonnage moving over debtor lines to Chicago and points north. Revenue from such tonnage and the allowance made in the computations of earnings for the transportation of Company coal constitute the bulk of the earnings shown for the Terre Haute lines. There is also a substantial amount derived from the longer haul by the debtor of property moving to and from eastern lines by reason of the fact that the points of interchange under debtor operation can be located upon the Terre Haute line east of Chicago thus increasing the haul of the debtor lines. This item of revenue results wholly from the fact that the Terre Haute is operated by the debtor and the other two items, which are the big items, likewise result from the fact that the rest of the debtor system is maintained as a going railroad using coal obtained on the Terre Haute line and transporting from those mines, which it helps to keep open, commercial coal to va-

rious points on its eastern lines. The accounting methods used in allocating earnings to the Terre Haute do not reflect or attempt to measure the contribution of the rest of the debtor system to the Terre Haute properties.

The report of the Commission, referred to at the hearing, in Investigation of Chicago, Milwaukee & St. Paul Railway Company, 131 I.C.C. 615, points out that prior to the operation of the Terre Haute properties by the debtor, or its predecessor, the Terre Haute was not earning its interest on its income bonds and its property is referred to in that report as a distress property. It is claimed that the rapid increase in the use of diesel power will materially decrease the earnings of the Terre Haute in the future in that the amount of coal used in the operation of the debtor will be greatly reduced. Some evidence was introduced directed to this point. There was also evidence indicating additional switching charges in a substantial amount would result if the Terre Haute property were operated independently from the debtor property. It is clear from the record that from the standpoint of the Terre Haute, some arrangement for its operation by the debtor is extremely desirable.

■ With a limitation upon the fixed interest debt as set forth in the plan, the Commission found that, after making provision for the equipment obligations and the Reconstruction Finance Corporation loans and providing for the Milwaukee and Northern bonds, as to none of which is it contended that too favorable treatment is given, the amount of fixed interest obligations remaining for distribution was such that if the Terre Haute bonds were left wholly undisturbed, they would constitute 27 per cent of the total amount of new fixed interest debt, exclusive of equipment obligations, and there would not be left for general mortgage bondholders fixed interest bonds in more than double the amount of the existing Terre Haute bonds, whereas, the mileage represented by the general mortgage is eighteen times that of the Terre Haute and the valuation, seventeen times. When this is considered in the light of the fact that the profitable character of the Terre Haute is dependent upon the continued operation of the rest of the system, it would seem neither to be unfair nor unreasonable nor inequitable that the Terre Haute bondholders be re-

quested to make some sacrifice in order to maintain the continued operation of both properties upon a basis reasonably assured by prospective earnings. All interests seem to feel there is reasonable prospect that the new company will earn both the fixed and contingent charges as provided in the plan. If that happens, then the making of 1.5 per cent of interest contingent upon earnings to the same extent, as provided with regard to the payment of interest on general mortgage, series "A" bonds, will not represent a sacrifice except to the extent of three-fourths of 1 per cent in the case of the Bedford Belt Railway Company and the Chicago, Terre Haute & Southeastern Railway Company bonds. This sacrifice does not seem to be an unreasonable or inequitable one in the light of the advantage to be obtained from having the entire system placed upon a financial structure which can be adequately supported. The Commission had only so much cloth with which to make a suit. It would hardly have been justified in using so much of the material to make the vest that enough would not be left to provide a coat and trousers.

The Terre Haute interests have suggested that the proposal of the plan is in the nature of a threat. This hardly seems fair to the Commission which has frankly and fully stated the facts making it necessary to follow the course which was followed in preparing the plan. The Commission was faced with a difficult problem. It adopted this course, as stated in its supplemental report, as a "necessary step in order that the processes of the reorganization of the Milwaukee may not be thwarted".

The objectors rely strongly upon the showing made as to the profitable character of the Terre Haute lease. This showing, however, is entirely one of operating results based upon certain accounting methods. The report indicates that the Commission felt that in determining whether or not the lease was profitable, consideration must be given to factors other than current operating results. Many such factors are present in this case. For example, the early maturity of the Terre Haute bonds, the substantial equipment vacancies, the possibility of exhaustion of the available coal supply, the possible substitution of diesel power and other considerations which are important in determining the real character of the lease. From still another point of view, a lease shown to be profitable under the method of accounting followed might in fact constitute a burden upon the lessee. Suppose, for example, the result of the operation of the Milwaukee System were such that the total amount earned and available for payment of Terre Haute rental and interest on its own obligations was only $1,000,000 per annum which is less than the rental provided under the Terre Haute lease. To require the continuance of this lease would mean that the entire Milwaukee System of 11,000 miles would have to be operated for the sole purpose of paying rent on less than 400 miles of line. This thought is well expressed in the Commission's report. In any event, Section 77 provides, without any qualification, the plans of reorganization may provide for the rejection of unexpired leases and executory contracts.

The objectors call attention to the rule prevailing in equity receiverships that a receiver is allowed a period within which to determine whether or not he shall affirm or disaffirm existing leases and that his action relates back to the date of the institution of the proceedings. Reliance is placed upon American Brake Shoe & Foundry Company v. New York Railways, 2 Cir., 282 F. 523, and other similar cases and upon the case of Palmer v. Palmer, 2 Cir., 104 F.2d 161, which arose out of the New Haven reorganization. Examination of the authorities discloses that this rule is one designed for the protection of the receiver or the trustee. It is based on the theory that it is proper that he should have a reasonable time in which to elect to affirm or disaffirm and if he does elect to disaffirm, he should not be required to pay the rental fixed to the date of disaffirmance. As a rule, the leases which are disaffirmed are those which are unprofitable and the cases in which the principle is announced are cases in which the earnings were less than the rental provided. The authorities seem to recognize that in a given situation there may be special equities which will afford a basis for a different result. This suggestion is made in Pennsylvania Steel Company v. New York City Railway Company, 2 Cir., 198 F. 721, and Pennsylvania Steel Company v. New York City Railway Company, 2 Cir., 225 F. 734, and the principle is approved in Westinghouse Electric Mfg. Co. v. Brooklyn Rapid Transit Co., 2 Cir., 6 F.2d 547, relied upon by the objectors.

Subdivision b of Section 77 provides that the plan of reorganization may reject unexpired leases and further provides that the adoption of an unexpired lease by the trustees of the debtor shall not preclude a rejection of such lease in the plan. Subdivision c (6) of Section 77 provides that after a lease is rejected and if the lessee, with the approval of the judge, shall elect no longer to operate the leased line, it shall be the duty of the lessor, at the end of a period to be fixed by the judge, to begin the operation of such line unless the judge, upon the petition of the lessor, shall decree, after hearing, that it would be impracticable and contrary to the public interest for the lessor to operate the said line, in which event it shall be the duty of the lessee to continue operation on or for the account of the lessor until the abandonment of such line is authorized. The first of these provisions clearly distinguishes between the right of the trustees to disaffirm and the right to disaffirm in the plan itself.

█ In this case, no action has been taken by the trustees to disaffirm the Terre Haute lease and the alternative of disaffirmance, if carried out, will be a disaffirmance by the plan itself as distinguished from disaffirmance by the trustees. The record in this proceeding shows that early in the reorganization the trustees made application to the court for authority to pay rental obligations arising under the Terre Haute lease and the court made an order authorizing the payment of interest due, or to become due, upon the Terre Haute bonds, which interest, as previously pointed out, the debtor is required to pay by way of rental. That order, made in 1935, has not been modified and pursuant to it the trustees have paid the interest on the Terre Haute obligations as it came due. Such interest, constituting rental, has been paid to the holders of the bonds and the bondholders have accepted it. They cannot demand more and they are the real parties in interest on the Terre Haute side. The parties, therefore, have carried on under the lease in the same manner as prior to the bankruptcy proceedings. It would be unreasonable to require the lessee, who has paid the stipulated rental to third parties pursuant to court order, to account for a further sum for the same period covered by the rental so paid. It would seem in accordance with equitable principles to treat the transaction as closed up to the point to which rental is paid and accepted.

In this case the plan provides that if the lease is disaffirmed, the disaffirmance shall be effective from the date when the court finds that the Terre Haute bondholders have disapproved the provisions to be submitted to them. The result is that if the plan is approved and there is disaffirmance, it must be effective as of that date unless the court concludes that such provision of the plan is contrary to law. The objection, therefore, goes to the power of the Commission and court to make this provision in the plan.

█ In the light of the authorities and the facts above recited, the court feels that it is clearly within the power of the Commission and the court to so fix the effective date of disaffirmance. Furthermore, it would seem that the circumstances here present a case where the equities are such that the disaffirmance provided in the plan should not relate back to the beginning of these proceedings even if the plan itself had not expressly provided that the disaffirmance should become effective as of the date of the court's finding that the Terre Haute bondholders disapproved the provisions submitted to them.

█ The contention, that if the Terre Haute lease is to be rejected a definite decision to that effect must be made prior to the submission of the plan to the debtor's creditors, does not seem to be supported by a proper interpretation of the statute. It is true that subdivision b of Section 77 provides that the term "creditors" shall include the holder of an unexpired lease. This same subdivision amplifies that definition by explaining that in the case of an unexpired lease, which is rejected by a trustee or by any plan, any person injured by such rejection shall be deemed to be a creditor of the debtor to the extent of actual damage or injury determined in accordance with principles obtaining in equity proceedings. Subdivision e provides for the submission of a plan to the creditors. The provision in that regard is that the plan, after it is approved by the Commission and by the court, shall be submitted by the Commission to the creditors whose claims have been filed and allowed. If the rejection is accomplished by the plan itself, then it is not complete until the plan has been confirmed, which confirmation takes place after submission to the creditors. Obviously then, at the time of sub-

mission to creditors, no rejection has been accomplished, and the lessor could not possibly be in the position of the holder of an allowed claim.

The situation in this case is no different from that in any other case where a lease is rejected by the plan itself and the argument presented by the objectors would lead to the conclusion that a lease could never be rejected by the plan since under their argument the rejection would have to take place before submission which is an impossibility since the rejection is accomplished by the confirmation of the plan which follows submission. The statute must be construed, if possible, to give effect to all of its provisions and the provisions requiring submission to creditors must contemplate submission to those creditors who occupy that status at the time of submission.

The statute does not require resubmission after the confirmation of the plan to a lessor under a lease which the plan provides shall be disaffirmed. Such a requirement would necessitate two submissions which is clearly not contemplated by the statute. There is nothing in the alternative character of the provision in this plan to differentiate it from the ordinary case of a rejection provided in the plan itself. There will be an alternative in the plan when it is submitted. The creditors of the debtor will be in the same position to consider the plan with the alternative in it as is the court. No creditor of the debtor has made any objection to the presence of this alternative. When the provisions upon which the Terre Haute bondholders are requested to act are submitted, the same alternative will be before them and they have it within their power to determine which alternative shall be adopted.

If the Terre Haute bondholders reject the provisions affecting them, it does not mean that the operation of the Terre Haute will cease. Attention has already been called to subdivision c (6) of Section 77 providing for continued operation either by the lessor or the lessee depending upon the finding of the court. Subdivision c (10) of Section 77 likewise provides, in the case of leased lines, that the court may refer to the Commission for its recommendations as to the method or formula by which the segregation or allocation of earnings and expenses may be made, which method or formula would apply in determining the earnings allocable to the Terre Haute during the period of operation for the lessor's account.

The court feels that the Commission, in dealing with the Terre Haute interests, handled a difficult situation in a very creditable manner and evolved a plan which is fair and equitable, all things considered.

### Milwaukee and Northern Bonds.

The bonds of the Milwaukee and Northern Railroad Company are next in order in discussing the matter of distribution. Two issues of bonds are involved. The first mortgage bonds, which are a first lien upon the northern lines south of Green Bay, and the consolidated mortgage bonds, which are a first lien upon the northern lines north of Green Bay. Counsel for the trustee under both mortgages participated in the hearing and in argument frankly advised the court that he did not feel it would be safe to increase very much the amount of fixed interest bonds and contingent interest bonds that the new company should carry. He further stated that in the light of the earnings showing in recent years, evidence as to which was introduced at the hearing, it was concluded that it would not be advantageous to these two groups of bondholders to seek to get back the property and operate it for their own account and that it was better for them to take the provisions finally made in the Commission's plan than to undertake to fight for a better provision. The evidence referred to indicates that the northern lines as a whole during the years 1937, 1938 and 1939 operated at a deficit but the portion south of Green Bay, under the method of allocation used, earned in excess of interest requirements. In fact, interest was paid up to the last interest date prior to the time that the Commission's plan was announced.

Objection is voiced to the plan by two groups representing holders of Milwaukee and Northern bonds. The group most active at the hearing was represented by Anglo-Continentale Treuhand, A. G. It is the contention of that group that, taking into consideration the valuation of the northern lines and the earnings, better treatment should be accorded them. The group represented only $1,000, principal amount, of first mortgage bonds.

The Commission, recognizing the earnings showing of the first mortgage line, accorded to the first mortgage bonds of the Milwaukee and Northern superior treatment, so far as the distribution of bonds of the new Company is concerned, to that re-

ceived by any other creditor with the exception of the Reconstruction Finance Corporation and allotted to said first mortgage bonds 70 per cent of the outstanding principal and interest in new first mortgage system bonds. For the remaining 30 per cent, there were allotted series "A" general mortgage bonds. The consolidated mortgage bonds were given the same treatment as the general mortgage bonds next discussed. Those who object on behalf of the general mortgage bonds state that they have no objection to the treatment received by the bonds of the Milwaukee and Northern. It appears that in the light of the facts disclosed by the record and with the limited capitalization and fixed interest charges necessarily imposed by the plan, the treatment received by these securities was all that they could reasonably expect and was, under the circumstances, fair and equitable.

### General Mortgage Bonds.

Next in order are the general mortgage bonds. Objection to the plan is made by the trustee under the general mortgage and by a group of general mortgage bondholders headed by Princeton University. They claim that the plan from their point of view is not fair and equitable and urge that their mortgage constitutes a first lien upon the so-called heart of the system and that allotting to them only 25 per cent of their holdings in new first mortgage bonds violates the principle of absolute priority which they assert is required under the rule of Northern Pacific R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, and Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110. They further urge that they should be relieved of the burden of the unprofitable western lines; that the Commission had no jurisdiction to impose a mandatory additions and betterments fund to be paid out of earnings and urge that if this provision be eliminated, they should receive 67 per cent of their present holdings in first mortgage bonds. Finally they urge that the securities to be received by them under the plan will be diluted by giving to junior lienholders some securities of equal rank.

The attitude of this group toward the Terre Haute is interesting. They claim that the Terre Haute lease should be disaffirmed and point out that if the Terre Haute were independently operated or were acquired by some other carrier, the debtor could still acquire its coal supply from points on the Terre Haute line and if this resulted in profit to the Terre Haute, the profit would in the end go to the debtor as it owns 97 per cent of the stock. They suggest that upon the disaffirmance of the Terre Haute lease no permanent lease should be authorized but that the trustees should negotiate short term operating agreements. They further suggest that the Terre Haute bonds should be left undisturbed as a lien upon the Terre Haute properties except for such agreement as may be reached for an extension or change in interest rate.

The Commission, in its report, after dealing with the claims of the Reconstruction Finance Corporation, the Milwaukee and Northern first mortgage bonds and the Terre Haute lease, says: "The new bonds remaining available under our plan, after provision for the claims just mentioned and for new money, will consist of approximately $40,421,864 of first mortgage bonds and $108,012,719 of general mortgage bonds, series A and series B, while the secured creditors for which provision remains to be made consist of five classes holding, respectively, $5,072,000 of Northern consolidated mortgage bonds, $138,788,000 of the old Milwaukee's general mortgage bonds, $106,395,096 of the debtor's 50-year mortgage bonds, $182,873,693 of the debtor's adjustment mortgage bonds and $3,000,000 of the Gary first mortgage bonds. Including unpaid interest accrued to December 31, 1938, these claims amount to approximately $555,000,000."

The Commission then concludes that, treating the Northern consolidated bonds on the same basis as the general mortgage bonds, these groups could be allotted only 25 per cent in new first mortgage bonds, 35 per cent in new general mortgage series "A" bonds, 20 per cent in new general mortgage series "B" bonds and 20 per cent in new preferred stock.

The court is of the opinion that the plan of reorganization certified by the Commission observes the rules of law concerning the priority rights of the various claimants in all respects. The court approves the finding of the Commission "that, within the limits of total capitalization and total fixed charges approved, any material changes in the distribution of the new securities would render the distribution less equitable from the standpoint of relative rights." The plan of distribution followed by the Commission would seem to be in accord with sound principle and should have judicial approval.

As to the burden imposed upon the General Mortgage lines by the western lines, it should be noted that this burden is an operating burden. The operation of the western lines may not be discontinued in the absence of a certificate of convenience and necessity and no one, not even the general mortgage bondholders, has suggested that such operation be discontinued. The advantage resulting from the elimination of divisional mortgages is obvious. In fact, many of the difficulties arising in current reorganization proceedings are attributable in large measure to the existence of many mortgages on parts of a system. The desire of the Commission to eliminate that objection is commendable.

The necessity for an adequate additions and betterments fund in the maintenance and operation of any railroad is obvious. There is ample evidence in the record to support the conclusion that the amount of $2,500,000, provided for this purpose, is necessary in addition to the funds available from equipment depreciation charges and road retirement charges in operating expenses and salvage recovered from property retired. Such additional amount must either be provided out of earnings or the railroad must borrow it. In the light of railroad experience in the past, it would seem preferable that such requirements be met from earnings. Reasonable provision for additions and betterments to be paid out of earnings does not, it is believed, violate any rights of the security holders.

Likewise, it does not appear that the treatment accorded the fifty year and Gary mortgages gives any just ground of complaint to general mortgage bondholders in the light of the amount of first mortgage and general mortgage series "A" bonds awarded them.

In this connection, it should be noted that the institutional investors group owns over 32 per cent of these general mortgage bonds, and this group, which likewise owns a substantial amount of all of the issues involved, feels that the entire allocation of the securities of the new company under the plan is fair and equitable. The basis of distribution is, of course, not capable of exact mathematical computation. The Commission and the court are required to make and approve a fair and equitable distribution of the securities available and the court believes that this has been done in this instance.

## Fifty Year Bonds.

Objection on the part of the fifty year mortgage bondholders is voiced both by the mortgage trustees and by the protective committee of the bondholders. Both presented arguments in opposition to the plan and yet neither could suggest what might be done to remedy the plan to meet the situation. One counsel suggested the possibility of severing the western lines but counsel for the protective committee took the position, which seems to meet with general approval, that it is necessary that the lines be preserved in one system. The difficulty with the western lines is that the testimony introduced before the Commission and that introduced before the court showing the pertinent information down to date shows that the western lines are deficit lines; that their earnings during the past few years have been insufficient to meet operating requirements. In making the computations, earnings from the pieces of lines east were allocated to the western lines. On the other hand, it is pointed out that, so far as the western lines are concerned, the fifty year bonds are not junior to the general mortgage bonds, since the latter have no lien on the western lines. Attention is also called to the fact that the first and refunding mortgage, which is senior to the fifty year mortgage, ceases to be important by reason of the treatment accorded to the claim of the Reconstruction Finance Corporation and the resulting release and cancellation of the first and refunding mortgage bonds.

The fact is, however, that under the situation presented to the Commission and to the court, the fifty year bonds are in the position of second lien bonds with a poor earnings record. Some complaint was voiced as to the method followed in arriving at the allocation of earnings used in the exhibits but no better method was suggested and no sound reason was advanced in support of a different result.

The following from the Commission's report seems a correct analysis of the situation of these bonds: "If the holders of the 50-year bonds are assigned a part of the new series B income bonds only, as herein provided, they will begin to share earnings with the general mortgage bonds and Northern consolidated bonds after $9,675,000 of prior charges, including a payment of $2,500,000 to the additions and betterments fund, such charges reflecting the respective amounts of equipment obliga-

tions, etc., upon which this approved plan is based. We think that this treatment goes far toward resolving the doubts as to the accuracy or fairness of the allocation of earnings in favor of the 50-year bonds, without injustice to the general mortgage bonds. In any event, under the new capital structure which we contemplate, it would be impracticable to assign to these claims new securities wholly junior to those assigned to the holders of the general mortgage bonds. Also, it is impracticable to avoid the assignment of preferred stock to part of the claims of both the 50-year bonds and the general mortgage bonds, resulting in a parity of treatment to the extent of 20 per cent of each claim. (See appendix.) However, the 50-year bonds will rank wholly junior in status to the claims of the Finance Corporation and the Northern first mortgage bonds. We see no means by which the exact present lien position of the general mortgage bonds or the 50-year bonds can be preserved except under a prohibitive mortgage structure."

Under the circumstances, it would seem that the treatment accorded these bonds under the plan is fair and equitable.

### Gary Bonds.

The same may be said of the Gary bonds. The Gary line has a record of poor earnings. Some evidence was introduced tending to show the scrap value of the property. The property cannot be scrapped except through abandonment pursuant to appropriate order by the Commission. Moreover, no one has seriously suggested that that procedure should be followed.

The Commission gave further consideration to the Gary claim upon petition for modification of the report and concluded that the Gary bonds should receive 75 per cent in new preferred stock and 25 per cent in new common stock whereas under the original plan only common stock was to be allotted to the Gary bondholders. There is nothing in the record which would justify better treatment for this group.

### Adjustment Bonds.

What has been said with reference to the fifty year bonds is equally applicable to the adjustment bonds. They are junior liens upon the same property covered by the prior liens of the fifty year mortgage and the first and refunding mortgage. The Commission allotted to them out of the permissible capital structure all that was left after satisfying prior claims. It could do no more.

### General Creditors.

No objection has been made to the conclusion of the Commission that the only equity in the property of the debtor which can be used as the basis of securities to satisfy the claims of general creditors is confined to the value of the debtor's free assets. The Commission finds that not to exceed 55,000 shares of new, no par, common stock may be issued against those assets, of which amount 39,163 shares are allotted to the holders of the adjustment bonds. The remaining 15,-837 shares are to be applied in settlement of all other unsecured claims on the basis of approximately 0.7 of a share for each $1000 claim.

### Personal Injury Claims.

The only objection filed by any unsecured general creditor was filed on behalf of Ida E. Herschensohn and Herbert L. Herschensohn who hold claims for personal injuries sustained on August 26, 1934, at the depot of the debtor at Milwaukee, Wisconsin. The claimants were not employees. Their claims were filed and allowed by the master as general claims. The claimants object to the plan because it does not make provision for the payment of these and similar claims as prior claims. The claimants rely upon the so-called six months' rule applying in receivership proceedings and assert that the claims in question are the type of claims allowable under that rule and that they should be satisfied in full as current liabilites.

Subsection b of Section 77 provides that unsecured claims, which would have been entitled to priority if a receiver in equity had been appointed on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors. However, the rule applying in equity receiverships is that, in order to entitle a claim to priority, it must appear, first, that the origin of the claim was a current expense of ordinary operation of the railroad necessarily incurred to keep it a going concern, second, that the claim accrued within a reasonably brief time, generally construed to be six months prior to the appointment of the receiver, and, third, that the claim represented a debt contracted with the expectation or intention that it was to be paid out of current earnings of the railroad. This rule is announced by our own Circuit Court of Appeals in Commonwealth Edison Co. v. Continental Bank, 7 Cir., 93 F.2d 265. Claims for personal injury are not such claims as satisfy the requirements just men-

tioned. Obviously, they do not constitute current expense of ordinary operation necessarily incurred to keep the railroad a going concern. As stated in American Surety Company v. Wabash Ry. Co., 8 Cir., 107 F. 2d 685, 689: "Heretofore, the courts have consistently decided that personal injury claims, arising in course of the operation of the railroad—even to employees—were without the rule."

When Section 77 was enacted, this rule, that personal injury claims are not within the class to which priority was given in equity receiverships, was recognized and the statute, subsection n, provides: "(n) In proceedings under this section, and in equity receiverships of railroad corporations now or hereafter pending in any court of the United States, claims for personal injuries to employees of a railroad corporation, claims of personal representatives of deceased employees of a railroad corporation, arising under State or Federal laws, and claims now or hereafter payable by sureties upon supersedeas, appeal, attachment, or garnishment bonds, executed by sureties without security, for and in any action brought against such railroad corporation or trustees appointed pursuant to this section, shall be preferred and paid out of the assets of such railroad corporation as operating expenses of such railroad."

This subsection, it will be noted, extends priority to claims for personal injuries to employees. The claimants here were nonemployees and are, therefore, not within the provision of subsection n.

Claimants rely upon the case of In re Chicago, Rock Island & Pacific Ry. Co., 7 Cir., 90 F.2d 312, 113 A.L.R. 487, as supporting the rule that claims of this character should be allowed as current expenses. A reading of the case discloses, however, that the claims there passed upon were based upon supersedeas bonds which are expressly included within subsection (n) quoted above. The language in that case, relied upon by the claimants, is used to support the conclusion reached by the court that the classification employed in the statute to give priority to claims listed in subsection (n) was a reasonable classification. The case is no authority whatsoever for giving priority to personal injury claims of nonemployees.

The question is squarely presented in Re New York, New Haven & Hartford Railroad Company, 2 Cir., 92 F.2d 428, 114 A. L.R. 1151, in which case the court points out that the only personal injury claims entitled to priority under subsection (n) are those of employees. See, also, Maloney v. Missouri Pacific R. Co., 8 Cir., 95 F.2d 213.

In the light of the authorities and the express provisions of the statute, the objections of these claimants are without merit.

### Provisions for Carrying Out Plan.

The plan contains many provisions which might be classed as mechanical in character and which relate to the method of carrying out the reorganization. No objection has been made to any of these provisions except the provisions for a voting trust. In the first report of February 12, 1940, the Commission eliminated any provision for a voting trust. However, when the matter was reconsidered, the Commission, in its supplemental order of June 4, 1940, provided for a voting trust, having concluded, as stated in the supplemental order, that such a provision "would be desirable in order to insure continuity of managerial policy, protection to the bondholders and proper maintenance of the property, all of which are in the public interest." This conclusion seems justified from the record.

### Corrections and Clarifications.

Subdivision Q of the plan provides that the court may cure any defect, supply any omission or reconcile any inconsistency in such manner or to such extent as may be necessary to carry out the plan effectively.

Attention has already been called to one error in the designations in the Revised Appendix of certain series of general mortgage bonds as "Series D" and "Series E", the correct designation of which should be "Series E" and "Series F". This same error appears in subdivision L(6) of the plan (page 35 supplemental order, printed record page 7092) and should be corrected by changing "Series D" and "Series E", referred to in that paragraph, to "Series E" and "Series F", respectively.

Certain other proposals have been made by the bankruptcy trustees to none of which has any objection been offered and all of which will be adopted to the extent hereinafter set forth. Their adoption by the court is conceived to be within the authority granted in subdivision Q of the plan. Said proposals, so adopted, are as follows:

1. In subdivision E of the plan (page 10 of the supplemental order, printed record page 7072) the word "trust" will be stricken from the first line of the indented portion

designated (a) of the paragraph providing the uses which may be made of the reserve and retirement fund, which correction will extend such use to equipment obligations generally as it is thought was intended.

2. In subdivision G of the plan (page 20 of the supplemental order, printed record page 7080) the provision in the proposed new Terre Haute Lease includes "not exceeding $12,000 a year to pay the taxes and corporate expenses of the Terre Haute." The words "taxes and" will be stricken from this portion, it appearing that the property taxes, alone, on the Terre Haute properties amount annually to many times this sum and obviously the Commission could not have intended that such an amount would cover taxes. The court understands that it was intended that the lessee was to pay the taxes as now provided in the existing lease.

3. The last paragraph of subdivision H(1)(b) (page 24 of the supplemental order, printed record page 7083) will be amended to read: "If the new company shall establish and maintain, in such manner as may be permitted or required by law or lawful regulation, an operating expense account for its roadway and structures, then the additions and betterments fund shall be paid from the reserve for depreciation on roadway and structures so credited in respect of the applicable income period, to the extent that the amount so credited to said depreciation reserve shall be adequate therefor. If, likewise, the new company shall charge to operating expenses in any year the cost of any additions and betterments, properly chargeable to capital account under the rules now in effect, then the amount of such charges shall be credited to the additions and betterments fund as a reduction of the payment into the fund for that year. However, in case the accounting rules now in effect are changed, they shall not operate to reduce the amount of funds available for additions and betterments below the amount which would be available under an application of existing accounting rules."—the purpose being to protect the new company against any reduction in the amounts available for additions and betterments by a change in accounting rules now in effect.

4. The second paragraph of subdivision M of the plan (page 38 of the supplemental order, printed record page 7095) will be amended to read: "The new company shall be deemed to have assumed the obligations under existing executory contracts (except the present lease of the Terre Haute and the guaranty of the Terre Haute income-mortgage bonds), which by their terms do not terminate at or prior to the conclusion of the reorganization proceedings and which shall have been affirmed by the bankruptcy trustees prior to confirmation of the plan, and the new company shall also assume any executory contracts made by the trustees, with the approval or authorization of the court, which by their terms do not terminate at or prior to the conclusion of the reorganization proceeding. Provided, however, that the new company shall have such rights to terminate contracts or leases entered into by the debtor or by the trustees since June 29, 1935, as are set forth in said respective contracts or leases, which rights shall be exercised within the time set forth therein, and if no definite time is fixed by the terms of such contracts or leases then the right shall be exercised by the new company within six months after the entry of the final decree in these proceedings, or such further time as may be provided in such decree."—the purpose being to carry over to the new company the right to exercise provisions for termination contained in existing contracts entered into during the pendency of the proceedings.

5. Immediately preceding the last paragraph of subdivision M there shall be added a new paragraph (page 39 of the supplemental order, printed record page 7095) reading as follows: "The new company shall have authority to pay, when the amount thereof has been definitely determined, all claims to the extent that they are unpaid by the trustees falling within the class or classes of those claims which the trustees have been authorized to pay by any order or orders of the court."—the purpose being to authorize the new company to continue to completion payment of claims of a class or classes authorized to be paid by orders of the court but not paid on account of accounting or other difficulties encountered in determining the amounts. Many claims of other carriers are included in such classes. This correction meets the objections filed on behalf of the New York Central Railroad and the Pennsylvania Railroad.

6. In the last paragraph of subdivision M of the plan (page 39 of the supplemental order, printed record pages 7095 and 7096) a clerical error will be corrected by changing the reference to claims arising from the disaffirmance of executory leases or contracts to read "of the trustees" instead of

"by the trustees." This correction appears to have been made in the printed copy of the supplemental order. In addition, there will be added at the end of said paragraph the following: "Claims, arising from the disaffirmance of executory leases or contracts of the debtor, shall constitute general unsecured claims against the debtor, and shall be satisfied in the same manner as other general unsecured claims by the allocation of common stock in the manner provided in the plan."

This provision is deemed proper in the interest of clarity.

7. Immediately following the second paragraph of subdivision M (page 39 of the supplemental order, printed record page 7095) as amended by "4" above, there will be added the following: "The bankruptcy trustees may at any time up to the final consummation of the plan disaffirm any executory contracts of the debtor or which constitute obligations of the debtor entered into prior to the filing of the petition for reorganization herein and as to which the trustees have not assumed obligations pursuant to court approval or authorization and any claims or damages resulting from such disaffirmance shall be treated in the same manner as herein provided for general unsecured creditors, and the court shall retain jurisdiction for the purpose of disposing of the same. All such contracts not disaffirmed by the trustees or in the plan shall be deemed to have been affirmed by the trustees and shall be assumed by the new company."

The purpose of this provision is, first, to extend the right of disaffirmance to as late a date as practical, and, second, to avoid the necessity of positive action by the trustees to affirm all existing contracts desired to be continued of which there appears to be a great number.

With these corrections and clarifications, which it is thought can be properly made within the framework of the plan itself, the court is satisfied and concludes that the provisions of the plan comply with the provisions of subsection b of Section 77 of the Bankruptcy Act, that the plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders, that the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed, so far as they could be ascertained at the date of the hearing, are reasonable, are within such maximum limits as are fixed by the Commission and are, within such maximum limits, subject to the approval of the court, which approval is hereinafter indicated, that the plan provides for the payment of all costs of administration and all other allowances made or to be made by the court, and that all of the statutory prerequisites to the approval of the plan as certified by the Interstate Commerce Commission have been met.

### Allowance for Fees and Expenses.

The only question remaining relates to the applications for allowances for fees and expenses incurred in connection with the reorganization and the plan. Claims were filed by all of those asking for such allowances and an extended hearing was had upon said claims before an Examiner of the Interstate Commerce Commission at which exhaustive evidence was introduced on behalf of the several claimants. The Commission, upon the record so made, has fixed the maximum limits to be allowed to all claimants for the period up to May 15, 1940, and the question of allowances has been submitted to the court upon the record so made before the Commission's Examiner. The Examiner had the opportunity of observing all of the witnesses and the testimony, as shown by the Commission's report, has been fully considered and the court finds that the maximum limits so fixed in each case constitute reasonable allowances to be made to the respective claimants without prejudice to the right of any claimant to present further claim for services rendered or expenses incurred subsequent to May 15, 1940, in connection with the proceeding or plan.

Except to the extent that proposed corrections and clarifications are approved herein, all objections to the plan will be overruled and the modified plan, as certified to this court by the Interstate Commerce Commission, with the corrections and clarifications herein set forth and as herein interpreted, will be approved and the fees and expenses will be ordered paid in the amounts fixed as maximum limits by the Interstate Commerce Commission.

Counsel will promptly prepare and, on notice, present proposed findings of fact and conclusions of law and a decree or decrees consistent with the views herein expressed.

# EXHIBIT "A".

## REVISED APPENDIX.

### C. M., St. P. & P. R. R. Co. Reorganization, F. D. 10882

| Present Obligations and Stock | Principal Amount | Interest accrued to Dec. 31, 1938 and not authorized to be paid | Total | | Approved Plan as modified | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Undisturbed or Extended | First Mortgage Bonds | General Mortgage 4½% Bonds Series A | Series B convertible | 5% Preferred Stock | Common Stock No-par Value shares | |
| | | | | | (4% interest except Terre Haute bonds) | | | | | |
| Equipment obligations .......$ 33,322,999 | $ 33,322,999 | $ | $ 33,322,999 | $33,322,999 | $ | $ | $ | $ | | |
| R. F. C. loans............. | 12,920,463 | | 12,920,463 | | (100%) $11,947,164 | | | | | |
| Note to Cont. Ill. Nat. Bk. & Trust Company ......... | 1,184,000 | | 1,184,000 | 1,184,000 | | | | | | |
| Terre Haute bonds: | | | | | | | | | | |
| So. Ind. Ry. 4s, 1951..... | 7,287,000 | | 7,287,000 | | 7,287,000 | | | | | |
| Bedford Belt Ry. 5s, 1938.. | 250,000 | | 250,000 | | 250,000 | See Note. | | | | |
| T. H. first & ref. 5s, 1960.. | 8,056,000 | | 8,056,000 | | 8,056,000 | | | | | |
| T. H. Income 5s, 1960...... | 6,336,000 | | 6,336,000 | | 6,336,000 | | | | | |
| Mil. & Nor. R. R. bonds: | | | | | (70%) | (30%) | | | | |
| First mtg. 4½s, 1939..... | 2,117,000 | 103,204 | 2,220,204 | | 1,554,143 | 666,061 | | | | |
| | | | | | (25%) | (35%) | (20%) | (20%) | | |
| Consol. mtg. 4½s, 1939.... | 5,072,000 | 247,260 | 5,319,260 | | 1,329,815 | 1,861,741 | 1,063,352 | 1,063,352 | | |
| General Mtg. bonds, 1959: | | | | | (25%) | (35%) | (20%) | (20%) | | |
| Series A, 4s.............. | 48,241,000 | 5,653,090 | 53,894,090 | | 13,473,523 | 18,862,931 | 10,778,818 | 10,778,818 | | |
| Series B, 3½s............ | 8,950,000 | 920,211 | 9,870,211 | | 2,407,553 | 3,454,474 | 1,974,042 | 1,974,042 | | |
| Series C, 4½s............ | 42,597,000 | 5,652,191 | 48,249,191 | | 12,082,298 | 16,887,217 | 9,649,838 | 9,649,838 | | |
| Series E, 4½s............ | 24,000,000 | 3,217,320 | 27,217,320 | | 6,864,330 | 9,520,062 | 5,443,464 | 5,443,464 | | |
| Series F, 4½s............ | 15,000,000 | 2,137,351 | 17,137,351 | | 4,254,345 | 5,908,083 | 3,427,476 | 3,427,476 | | |
| | | | | | (70%) | (15%) | (15%) | (60%) | | |
| 50-yr. mtg. 5s, 1975...... | 106,395,006 | 20,835,706 | 127,230,802 | | | 19,084,621 | 76,338,481 | | (25%) | |
| Convert.—Adjust. mtg. 5s, 2000. | 182,373,693 | 79,560,055 | 262,423,748 | | | | | | 318,077 | |
| | | | | | | | | | 1,749,402 | |
| | | | | | | | | | 30,163 (c) | |
| | | | | | | | | | (25%) | |
| Gary first mtg. 5s, 1948...... | 3,000,000 | 562,500 | 3,562,500 | 5,000,000 (Assumed amount of new money bonds issued in reorganization. Interest assumed at 4%) | | | | | 8,906¾ | |
| Unsecured claims (9/30/37).... | 445,162 | | 445,162 | No equity | | | | | 15,837(d) | |
| Total debt ............... | 508,047,413 | 118,876,018 | 626,926,331 | No equity | | | | | | |
| Preferred stock .......... | 119,307,300 | | | | | | | | | |
| Common stock, no-par value.. | 1,174,660 shs. (b) | | | | | | | | | |
| | | | | | | | | (70%) | | |
| | | | | | | | | 2,571,875 | | |
| Totals, New Company 34,500,099 | | | | New, Company 34,500,099 | 58,923,171 | 67,236,069 (See Note) | 51,422,111 | 111,347,846 | 2,131,476¾ | |
| | | | | | 21,929,000 | | | | | | |

### SUMMARY

| | Principal Amount | Annual Charges |
|---|---|---|
| Equipment obligations, to be assumed; maturities to be re-arranged in part ...........$ | 33,322,999 | $ |
| Bank note, undisturbed ....... | 1,184,000 | 1,286,000 |
| First Mtg. bonds of new company ..................... | 58,923,171 | 23,680 |
| New Terre Haute bonds; portion representing fixed interest ..... | 15,350,300 | 2,356,927 |
| | | 603,047 |
| Total fixed int. debt......... | 108,780,470 | 4,269,654 |
| Adds.—Betts. fund; mandatory payment ...................... | | 2,500,000 |
| Gen. mtg. 4½% income bonds of new company .............. | 108,678,780 | 4,890,545 |
| New Terre Haute bonds, portion representing contingent interest | 6,578,700 | 328,935 |
| Total system debt............ | 224,037,950 | |
| Sinking fund, approx............ | | 543,394 |
| Charges ahead of dividends...... | 111,347,846 | 12,532,528 |
| New 5% preferred stock......... | | 5,567,392 |
| New no-par common stock, shown at $100 a share............... | 213,147,525 | |
| | 548,633,321 | |

Percent of debt to total capitalization—40.8

Note: These items, strictly not a part of the capital structure of the new company, are included here since, under the plan, the new company will assume obligation with respect to principal and interest of the four classes of Terre Haute bonds, if the terms thereof are modified as provided in the plan. Such modification includes the provision that the bonds will bear fixed interest at the rate of 2.75 percent and contingent interest at the rate of 1.5 percent per annum.

(a) Reflecting repayment of $290,000 Jan. 3, 1939. Further reduced for purpose of the plan by crediting $973,239 cash in hands of first and refunding mtg. trustee Dec. 29, 1938, leaving $11,947,164 to be discharged by issue of new securities.

(b) Not including capital stock of the Terre Haute. Of such stock, 1,259 shares are not owned by the Milwaukee.

(c) Additional common stock assigned on basis of free assets.

(d) Other additional common stock issued on the basis of free assets; to be issued to holders of unsecured claims as provided in the plan.